Good morning, all. Our first case for argument is Minerva Dairy v. Harsdorf. Ms. Bowden. May it please the Court, Anastasia Bowden for appellants who I will collectively refer to as Minerva Dairy. The government has no interest in informing consumers about whether a particular product pleases the government. This means that Wisconsin's butter grading law is not just bad policy, it is affirmatively arbitrary. The butter grading standard is not based on quality, it's based on whether the government likes the way that a butter tastes or looks or feels. This would mean that the government has permission to establish whether a blanket is cuddly or whether they like the feel of a certain mug. And we would argue that the government doesn't have an interest in establishing fondness standards for a given commodity. The Department of Health ---- Now, Ms. Bowden, good morning. Consumers may not understand what the grades signify, but don't they understand that double A is better than A, and A is better than B? Other products like apes, for example, are graded in this way, and consumers understand that the letters signify a level of quality, don't they? Well, we argue that that's exactly part of the problem, Your Honor, is that the government is going and grading commodities based on whether it likes it or not and deeming products better or worse, basically on the government's whim. And that's not legitimate because the effect is going to be to burden artisanal producers or producers of commodities that are new or innovative but are perfectly safe for consumption or for the public merely because the government likes it or doesn't like it, based on subjective factors. And that's the definition of arbitrariness. Moreover, other types of grading are typically done on the basis of objective factors like uniformity or, in the case of potatoes, one of the factors is whether a potato is blighted or has some indication of disease, whereas butter grading is based solely on subjective preferences. You know, does the government like the taste of it? And beyond that, taste is subjective to begin with. Everybody tastes things differently. So I think that butter grading is affirmatively different from other types of grading and the fact that it boils down to just the government deeming products, quote, better or worse in its opinion is wise. How different from the grading of eggs? Pardon? How is it different from the grading of eggs? I'm not sure what factors go into egg grading. I don't think taste is one of them. But to the extent that egg grading is mandatory, I don't know that it is. If it were to be the same as… What makes you think taste isn't one of them? Pardon me? What would make you think that taste isn't one of them? Well, I guess because inspection typically has to do with the way that an egg looks or maybe weighs. I'm not sure that they cook or taste eggs when they grade them. I don't know. But if grading of eggs did have to do with taste, it might face similar problems. I don't know, again, that egg grading is mandatory and that egg grading takes into these subjective factors like taste. But to the extent that it does and it deems some eggs better or worse based on taste, I think it would be subject to the same constitutional attack. The department argues that the butter grading laws furthers a host of rationales, but even the lax rational basis standard permits plaintiffs to present evidence to contradict those rationales. In Caroline Products, the Supreme Court stated that plaintiffs must have the ability to produce evidence to show that either the means are not related to the ends, that the ends are irrational, or even if a law was once rational, it is rational no longer due to changed circumstances. And that's exactly… Would you agree that the standards that Wisconsin uses are the same as the federal standards and that the federal standards have a very long history in the industry? Yes, Your Honor. They are substantially similar. I think there's a very minor difference. But the big difference here for our purposes is that the federal standards are discretionary. Here we have a mandatory system which imposes great costs on particularly artisanal producers for the benefit of big producers, really. And so it's a different type of burden. It may be rational under the federal system for some big producers to choose to undergo grading, but just because some big producers choose it under the federal system doesn't mean that it's rational to impose it as a mandatory system at the state level. If we should think, okay, that the Wisconsin statute has a rational basis, such that it would survive the due process inquiry, then wouldn't it also be rational for the state to distinguish between graded and ungraded butters? Well, I think that those are slightly different inquiries. Whether there's a reason for imposing the law is a different inquiry about whether there's a rational reason for distinguishing between two similar things. But we've also brought an additional equal protection argument, which is that it's not rational to distinguish between butter and other products that are regulated by the department. So other dairy products like milk or honey or all the other commodities we've listed in our briefs that the department has not regulated, even though the very rationale for imposing this law to butter applies with equal, and we would say with more force to the products that the department has left unregulated. And that's a separate equal protection claim. About graders, is that what you call them? What do you call the people who... Graders, yes. And there was a dispute about graders. One thing is they had to be from Wisconsin. And before that, of course, they had to... And when you're far away from wherever that is, as I understand now, they did change the rules so that a grader can be from elsewhere, maybe Ohio or whatever, but they have to take the test in Wisconsin. Is that correct? That's right, Your Honor. The former policy was overtly discriminatory. Since then, they have changed it informally. We know that they've done nothing to formally change the regulations or issue a former policy saying that they won't revert back to that discriminatory policy. So we're entitled to a declaration that the former policy was unconstitutional. But in addition to that, even now, if you are a grader from out of state, you have to travel in state to take the test, which, of course, imposes a greater cost depending on how far you are from the place of testing. That's every two years, I guess. And what, $75 or something like that? It's $75. You have to go and take the test, and then you can renew for a shorter fee, a smaller fee. Okay. Is that really a cost factor, or is that just some other disagreement that you would have to have a test, a grader? I'm sorry. Can you repeat that? Yeah. Is that an insurmountable or not insurmountable, but something that's at least partially fixed as opposed to the – I don't know what you're complaining about the cost. It's not prohibitive, but it's still a cost, travel and whatever, the $75 fee. But I don't know when now someone does grade. And then is that also an extra cost for someone who does that? Well, it depends on the particular butter maker's business model, Your Honor. So in our case, we have an artisanal producer who makes its butter in small, frequent batches, so they have to pay a grader every single time that they produce a new batch. Now, a butter maker could hire someone on staff and pay them a wage that way. You could have somebody on contract and pay them for each batch they grade. So it sort of depends on your business model what that cost is. And our argument here is that the costs are particularly burdensome for artisanal butter producers and butter producers like our client because not only do they frequently grade batches, but also if they're going to comply with this law, that they either have to change their entire distribution system so as to find a way to only label those products that are destined for Wisconsin, which is difficult to do given that they sell to intermediaries who then sell to places beyond their control. Or that effectively is going to mean they have to label every single batch of butter, no matter where it's destined, with the Wisconsin label. And not only is that costly in terms of changing their packaging, grading each time, and upending their distribution system, but it also has a very strong effect on their brand equity that they've developed as an artisanal butter maker. Butter grading standards are associated with commodity butter makers. They're intended for commodity butter makers. Our client doesn't want to be associated with commodity butters given that his whole brand is based around tasting differently, being a small, family-owned, special producer. You can imagine the effect if this was in beer. If every small craft brewery had to stamp their label with some sort of identifying marker that graded it in terms of what Coors Light tasted like or associated it with Coors Light standards, there would be a real harm to craft brewers' brand equity. And so that's one of the big costs that we assert in our brief. Well, do the big producers, whatever their brand names are, even in Wisconsin, does a grader have to grade every batch? Yes, Your Honor. Any batch that's destined for Wisconsin, sure. It's in Wisconsin, even. Right. So I guess what happens with those, they have in-house graders. Is that probably the case? And so that's just part of the job. I don't know whether they stick their finger in and taste it or what they do. It's a little bit perplexing. I hate to admit it, maybe it doesn't matter, but I remember when I was about six years old that whoever worked on the farm was churning butter, going up and down with something or other and churning it. Then it would wrap it up into really a butter ball. Really. And that's the way they made butter. I know it's a lot more sophisticated than that, but still, every batch has to be graded. And then it's, I guess, what is it, A or AA? And then you can go below that, I guess. Obviously, this is a small operation, and anything you do extra is costly. But we get back to the rational basis issue. A legislature passes a law or does whatever it does, and I have sort of maybe a jaded view, but I look at something, if a majority of a legislature passes something, it's presumably rational. Maybe that's presumptuous. I only spent one term in the state legislature, so I know a little bit, but a lot of things could happen in a legislature that are kind of crazy. But I guess that's what we're really looking at, either changing the laws or something that's just irrational about it. Well, I think Your Honor brings up two points, the first being that many of these large butter makers have graders on staff, which is an interesting fact, right, because the butter graders themselves are working for the butter makers, which means that oftentimes their grading turns out to be differently than when the state inspectors come around and check those grades. You mean they're given a higher grade than it deserves? Well, they may be, but also the fact of the matter is that taste is entirely subjective, so maybe they think that these things honestly taste better than what the state does, so we end up with these disputes showing how arbitrary this law is. But additionally, I would agree with you, Your Honor, that under the rational basis test, laws passed properly by the legislature are presumptively constitutional, but as the Supreme Court said in Caroline Products, to deny plaintiffs the ability to introduce evidence that laws do not further the purpose, any legitimate purpose, or that the ends are arbitrary, that would be to deny plaintiffs due process if they were unable to go into court and to provide record evidence that shows that this law is irrational. And this circuit has affirmed many times that under the rational basis test, laws must be something more than mere democratic preference. Democratic preference is not enough. And certainly you can imagine circumstances where the legislature is spinning a wheel and whatever commodity it lands on, it says, well, now that commodity is no longer allowed to be sold in this state. That could be a law duly passed by the legislature, but that would be irrational, that would be arbitrary, and that's prohibited under the due process clause. And that's essentially what we argue is going on here. This isn't bad policy. It's affirmatively arbitrary. It's the government coming in and saying, I prefer gavels that are oak and that sound a certain way when I knock them. That's a double A gavel, in my opinion. And I think that's affirmatively irrational regulation. Well, there's no dispute that your butter is unique. I say your, meaning your client. It's unique. I don't know if it's an old Amish recipe or something, rather, that some people prefer and it's unique. So there are a lot of products like that in anything. You were citing other examples of any product where there's a lot of variety. And is it – are there some that a grader might grade this butter as produced the way they want it as not making the grade? From what we understand, Minerva Dairy butter would not grade double A, and that's despite the fact that it is loved by citizens in 49 other states. It routinely wins taste tests at taste competitions. It's just a matter of preference, that it doesn't happen to meet Wisconsin standards, but it does certainly meet the preferences of consumers everywhere else. Is this butter distributed nationwide? Yes, Your Honor. So it's not that little. It's pretty big if you're stealing that. I mean, it's little to the extent that, let's say, Lagunitas is little, or every business starts out very small. Starbakes was once a small business. It's certainly not Land O'Lakes. It's different. It's artisanal. It's family-owned. It has been since it was started. It's smaller than the U.S. But it is growing and popular, and a lot of people like it. And other than Wisconsin, it's easily distributed. Sure, absolutely. Because people do love it, and it does win these taste tests. It goes to show that the taste preferences of America do not necessarily correlate with the taste preferences of Wisconsin. Ms. Bowden, do you want to save some time for a bottle? Yes, Your Honor. If there are no further questions, immediately I'll save my time. Judge Rovner, do you have a question at this time? I did have a question about the Commerce Clause. For purposes of the Commerce Clause inquiry, would you agree that out-of-state purchasers in northern Illinois or northeastern Iowa are not necessarily burdened any more than a producer in a distant corner of Wisconsin? Your Honor, I would argue that with regards to testing, the cost will depend on how far you are. So, sure, it's all based on proximity. And in some circumstances, maybe some people in a far corner of Wisconsin will be further than somebody with regards, you know, that's in a nearby state, sure. Thank you. Okay. Thank you, Ms. Bowden. Mr. LeRoy. May it please the Court, I'd first like to explain how Wisconsin's Butter Grating Law satisfies the Rational Basis Test, which disposes of all of Minerva's claims, and then explain where Minerva misunderstands the law and the facts of this case. So, the Butter Grating Law is rationally related to promoting consumer welfare and facilitating commerce. The grade signifies a minimum standard of quality in an easy-to-understand way, and transmitting such truthful and relevant information to our purchasers is a legitimate government interest. Now, Wisconsin arguably is making it difficult for Wisconsin consumers to access products that they may wish to purchase, and which pose no safety concerns. Is that sort of paternalism rational? I'm not sure if it's necessarily paternalism, Your Honor. So, the Supreme Court has held that the state may impose a quality standard above just a baseline safety standard for products, and that's the Hebb case that was a ban on certain milk products. And all laws that regulate the production of certain products, or any sort of labeling law, like nutrition labeling law, they increase the cost of production and therefore make it harder, in at least some marginal sense, for consumers to reach products. But that doesn't mean the law lacks a rational basis. And the reason why is here the butter grading law mandates disclosure of truthful and relevant information, and so the grading criteria is based on longstanding industry practices, and those practices themselves reflect the dominant market preferences. So, butter grading is based on objective characteristics of the butter that's readily discernible by competent graders. So, we have the flavor characteristics, the body characteristics, the salt, and the color. So, some of the examples of things that the graders will look for is whether the butter is acidic or bitter, whether it's crumbly or leaky, which means it has beads of moisture on the body, or whether it's sticky or gritty salt. So, these are objective characteristics that a competent grader can find. My friend mentioned that uniformity in a product is a legitimate thing that government can look for and mandate disclosure of. The butter grading law also has uniformity characteristics. It has to be uniform in body and color. Now, we get uniformity by describing defects in the butter, so whether the color is mottled or wavy. But by identifying defects, the implication is a uniform color has a higher grade. Another point is that butter grading, or something like butter grading, is still a widespread industry practice. So, in the appendix, page 42, this is the deposition of Michael Peterson. He says, quote, All states that produce butter have quality control, which looks for basically the same things, the implication being the same thing as grading. So, this quality control process, even if your state doesn't mandate butter grading, which at least six states do, your factory is going to be doing some sort of quality control that at least looks like butter grading. So, this just emphasizes that a rational legislature could conclude that this widespread practice actually looks at something truthful in the quality of butter and, therefore, could be potentially relevant to at least some purchasers of the butter. Is there a national standard of what is grade A butter? Yes, Your Honor. There's a national standard from the USDA. As far as color, taste, all that stuff. That's correct. So, as my friends have said, Wisconsin's standard is based on the USDA standard. They're materially identical, so the same types of characteristics in flavor, color, body, and salt. Now, of course, the USDA's is voluntary. Wisconsin's is mandatory. But if it's actually discerning some sort of truthful and relevant product information, then I don't think the shift from voluntary to mandatory can itself be what dooms the law under the rational basis test. So, my friends have also said that the state needs to present evidence, at least when contrary evidence is, or when evidence is presented by the challengers to the law. But the only thing that's required on the rational basis test is to show that a reasonable legislature could have concluded that the law would further a government interest, not that evidence actually exists in a courtroom to show that that relationship between legitimate interest and the means chosen actually exists. So, as this court has said, so in National Paint, for example, the court actually set aside a district court fact finding after extensive trial, and there that case involved Chicago's ban on spray paint. In that challenge, the district court had a fact finding that the ban would not actually limit graffiti, which was Chicago's asserted interest. And this court said that to say a factual dispute, quote, exists, indeed to say that one may be imagined, is to require a decision for the state. So, if there is a dispute on whether butter grating actually is, furthers a truthful and relevant, discloses truthful and relevant product information, if there's a dispute on that, then the court should rule in favor of the state on this under the rational basis test. And that's also in Beach Communications, the Supreme Court's canonical rational basis test case as well. So, I wanted to mention a couple of points where my friends misunderstand the facts of the record. They say that this law furthers just a protectionist interest or discriminates against partisans, but anyone may obtain a butter license. No butter is actually banned, and the law actually results in a diversity of butter at high grades. So, that's referenced at AB 43. So, we're not... Does a license require a certain grade level? So, the butter grater is what we have the license for, and then the grater will grade butter, and the results of that grating are AA, A, B, or under grade.  it may be sold in Wisconsin. So, do you know what the lowest grade would be? The lowest grade is called under grade. Okay. And so... And some people may really like that. Yes, perhaps so, but it's reasonable for the legislature to conclude that industry standards and dominant consumer preferences that those standards reflect should be disclosed to consumers on the package of butter. So, all it gets is a bad grade, or by comparison at least. You can still sell the butter. Well, yes. You can still sell the butter no matter what the grade is. You can sell it at retail. And so, in the record as well, Michael Peterson says that both large and small producers are just as competent at creating higher grade, high grade quality butter. And then it's more of the type of, quote, artisan butter or sort of like some more interesting flavored butters. Those also can score very well. So, my friends compare their product to Kerrygold butter. That's from Ireland. That has a more unique taste. That scores Wisconsin grade A and is now forced in Wisconsin... is now sold in Wisconsin, excuse me. It gets a grade A, you say? Yeah, that has a grade A. And so, this law is not forcing some sort of association with what they call commodity butter that ruins brand equity. Kerrygold, again, my friends have compared themselves favorably to. It scores well, and it maintains its unique brand equity and its unique type of product. So, it's not a protectionist sort of law. It doesn't discriminate against partisans. It doesn't force this association, what they call commodity butter. That's all right. It's labeling, doesn't it? I'm sorry? It requires that you label it, though. Yes, that's correct. You must label it with the Wisconsin grade, and Kerrygold does that as well. Judge Rover? Thank you. I gather that Minerva was initially told that licensed graders could not work outside of Wisconsin. And Ms. Bowdoin spoke of being concerned that the State could reimpose that requirement in the absence of a declaratory judgment that such a requirement would be unlawful. Is that a legitimate concern of hers? No, Your Honor. I don't think it's a legitimate concern. There was a dispute on what exactly they were told at the beginning of these proceedings. There was reference to a phone call in which the parties to the phone call may have misunderstood what the question was. So, Wisconsin law does not require you to be in Wisconsin to be a butter grader. They will license anyone in the State. Indeed, they will even license anyone in the world. If you apply, pay the $75 fee, and pass the licensing exam. You have to take the exam in Wisconsin, right? You do have to take the exam in Wisconsin. That's because the Wisconsin Department employees have to administer the exam. But that sort of discrimination, if it could be called that, is based solely on geography, not based on State lines. So, someone in Superior, Wisconsin, all the way up north near Minnesota would have a much farther distance to travel than someone even in Chicago hoping to get the butter grading license. And so, as this Court has said in Park Pet Shop, that type of differential burden based solely on geography, not taking account of the State's jurisdiction, that's not a Dormant Commerce Clause problem. And so, our position is that Wisconsin law is abundantly clear and that the Department does not have the ability to discriminate against out-of-staters who gets a license. So, Wisconsin Statute 975.175.2 says, No person may act as a butter grader without a license. A person desiring a license shall apply on a form, etc. There's no distinction on who it is. It's just a person may apply. And there's another important point here. So, this challenge is a challenge to Wisconsin's entire butter grading program. The relief they would like is a declaratory judgment that grading is unconstitutional. If there were a Dormant Commerce Clause problem, if Wisconsin were discriminating against out-of-staters, the relief would be a judgment from this Court saying that that discrimination is unlawful and that Wisconsin must allow out-of-staters to get a license. That's not what Minerva wants. Minerva only wants a declaration against the entire scheme. And now, again, there is no discrimination going on here. My only point is that the relief that would occur from a Dormant Commerce Clause judgment if we were violating that would not be the relief that they actually want. And so, I think the short answer is I think that's just a red herring issue in this case. Well, if someone takes whatever the test in Wisconsin, which they have to do, this is where you get back to this question. Does it mean that they have to meet a certain standard to get A or AA? And that standard may not include different taste, color, whatever you call the substance, et cetera, that Minerva approves and prefers? I guess I'm just curious what kind of a hurdle is it if you take the greater test? Can somebody flunk the test or whatever it is? So, they can certainly flunk the test. The test is on Wisconsin law and then on whether you can actually discern the different characteristics in butter samples. It doesn't ask you to, I guess I would say, change your butter-making practices. So, if Minerva wished to have one of their employees licensed, they wouldn't have to change their actual butter-making practices. The grader would just have to grade it accurately based on Wisconsin law and then affix the proper label. Well, so it wouldn't be a B then? A proper grade once a grader is, I don't know, is it trained or just tested or whatever they call it? So, they're just tested by the department. Most undergo some training, but that is not required. Really? Certainly. That's interesting. Anybody going to take the test? Sure, anyone can go and take the test. Basically just on taste? I like this butter, therefore I want to be a grader? No, it's certainly not just taste in that sense of the word. So, Wisconsin has 18 different flavor characteristics, 8 body characteristics, 4 color characteristics, and then 2 salt characteristics, and those are readily discernible and objective. And also, in the deposition of Michael Peterson, that's the department's grader, he says that all graders are, quote, very close when grading. So, my friends have said that there is some discrepancy, and it's true. There is minor discrepancies. Those discrepancies are usually worked out and they're usually based on whether or not a particular characteristic is present to a slight degree or a definite degree. So, it's actually quite close, even in graders not hired by the department. But each grader would have to know all 18 or 20 of those things you just mentioned? Yes, that's correct. They would have to know that, but that's what the grader license is for, and you only have to take the test one time, and then you just pay a biannual fee. Okay. So, unless the court has any further questions, I'd ask the court to affirm. All right. Thank you, Mr. Oliver. Ms. Bowden? Your Honors, with regards to the former policy, there is no dispute about what that policy is. If you read the deposition, it's very clear that they did not permit out-of-state butter makers to have a butter grader, a Wisconsin-licensed butter grader. That was the policy. They have not done anything to formally change it, and we are therefore entitled to a declaration that that past policy was unconstitutional. Whether the remedy is to strike down the whole thing or just to declare that past policy unconstitutional so they cannot resume it, that's a remedy question. But at the very least, we would be entitled to that declaration that that policy is unconstitutional. Did the district court consider that way, that argument? What the district court said was we argued in our brief that we were entitled to that declaration, but they said that the district court said we did not develop that argument. Right. We contend that that's because under a discriminatory, a straight-up discrimination dormant commerce clause inquiry, there is a per se rule of invalidity where the burden then goes to the government to show that there is an interest, a legitimate interest that cannot be served by less discriminatory means. The entire brief as a whole is dedicated to showing that there is no legitimate interest. That's what we argue in our rational basis argument, that there's no legitimate interest here. So I think together our argument was there's a per se rule here. There's no legitimate interest served by the policy, and it therefore fails the dormant commerce clause. With regards to AICs, I did get some clarity, and AICs are solely graded based on size. That is an objective factor. At least that communicates something to consumers that AICs are small or big. Here grading doesn't communicate anything to consumers because it's this composite score that takes into account all of these various factors. It doesn't communicate anything to consumers except that the government considers a better, a better good or bad, and we would argue that the government can't go around stamping products good or bad by whim. There was a question about... Bad meaning it doesn't meet a certain standard as opposed to being something you can't eat or sell. Right. Even the lowest grades can be tasted or can be sold in Wisconsin, which goes to show that they don't present any harm. The only harm is that a consumer may taste it and not like it. That is not just paternalism. It's the worst kind of paternalism that consumers can't decide for themselves whether they like a butter. That could happen with a grade A or double A. Pardon? Consumer could taste it and not like it. It could happen with a double A. Oh, certainly. They could taste it. Land O'Lakes, they could... Kerrygold is one of the most popular butters in the nation, and it scores A, which is worse than Land O'Lakes, which is a table butter, which scores double A. That just goes to show the arbitrariness of this entire scheme, that one of the most popular butters in America only scores A, whereas another popular butter scores double A. There was a question about whether there's a national standard, whether Wisconsin standards match a national standard for butter. Of course, that's not true because consumers across the country disagree. Not only do graders disagree about something, how something tastes, but the biggest discrepancy is between what consumers think and what Wisconsin thinks, and that's why these standards are arbitrary. Other than that, if the court has no further questions, we'll rest. Okay. Well, thank you, Ms. Bowden, Mr. Lurie, all counsel. The case is taken under advisement. The court will proceed to the second.